# CURTIN *v.* BENSON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 1.   Argued October 25, 1911.—Decided November 20, 1911.

While one must come into equity with clean hands, a defendant invoking the rule on the ground that plaintiff is praying for relief with an improper object in view must establish that fact.

Even if the United States can exercise over public lands the powers of a sovereign as well the rights of a proprietor, there are limitations; neither can be exercised to destroy essential uses of private property.

To take away an essential use of property is to take the property itself.

Whether a power is within constitutional limits is to be determined by what can be done under it, not what may be done.

It is beyond the power of the Secretary of the Interior or the superintendents of national parks under his control to limit the uses to which lands within the parks held in private ownership may be put; and so held as to regulations prohibiting grazing cattle on private lands within the Yosemite Park until such lands have been defined and marked by an agreed understanding.

Evidence, inadmissible generally but admitted by the court below for a particular purpose, cannot be extended by this court beyond the limited purpose of its introduction.

*Quære* whether owners of lands within National Park limits can be required to fence their lands, or whether the trespassing of their cattle on other lands can be made a criminal offense.

*Quære* whether an order of the Secretary of the Interior in regard to park lands can be construed as extending to toll roads constructed under authority of the State.

THE facts, which involve the validity of rules made by the Secretary of the Interior in regard to grazing cattle on private lands within the limits of Yosemite Park, are stated in the opinion.

*Mr. William C. Prentiss,* with whom *Mr. Marshall B. Woodworth* and *Mr. J. B. Curtin* in *propria personam* were on the brief, for appellants:

The Department of the Interior has no right to make or enforce any rules respecting the use of private property or

public toll roads within the State of California, for that State has not ceded to the United States its political jurisdiction over the Yosemite Park. The United States is simply an ordinary proprietor. *Lowe* v. *Railroad Co.*, 114 U. S. 525; *Chicago &c. Ry. Co.* v. *McGlinn*, 114 U. S. 542; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 167; *Palmer* v. *Barrett*, 162 U. S. 399; *Sharon* v. *Hill*, 24 Fed. Rep. 726, 731; *In re Ladd*, 74 Fed. Rep. 35; *State* v. *Mack*, 23 Nevada, 363; *United States* v. *Meagher*, 37 Fed. Rep. 878; *Crook* v. *Old Point Hotel*, 54 Fed. Rep. 608; *In re Kelly*, 71 Fed. Rep. 549; *United States* v. *Partello*, 48 Fed. Rep. 677; *Benson* v. *United States*, 146 U. S. 330.

However commendable the rules and regulations may be to protect and preserve the Park, and legal as to it, they can have no effect on or as to lands owned by private citizens or as to public roads of the State.

The right of way for the construction of highways over public lands not reserved for public uses is granted by § 2477, Rev. Stat., but every highway leading through the Park was constructed prior to creation of the Park and the lands within the park have not been reserved for public uses. The right to regulate highways is a police power and reserved in the State. *N. O. Gas Co.* v. *Louisiana Lighting Co.*, 115 U. S. 650; *Jones* v. *Brin*, 165 U. S. 182; *Patterson* v. *Kentucky*, 97 U. S. 501.

The police power—the right to administer their own internal affairs—was reserved to the States, *Mugler* v. *Kansas*, 123 U. S. 623; *Railway Co.* v. *Mackey*, 127 U. S. 205; *Holden* v. *Hardy*, 169 U. S. 366; *St. Louis &c. R. Co.* v. *Paul*, 173 U. S. 404; *Tullis* v. *Railway Co.*, 175 U. S. 348; *Gundling* v. *Chicago*, 177 U. S. 183; *Knoxville Iron Co.* v. *Harbison*, 183 U. S. 13; *Atkins* v. *Kansas*, 191 U. S. 207; *Jacobson* v. *Massachusetts*, 197 U. S. 11; *Minnesota Iron Co.* v. *Kline*, 199 U. S. 593; *Western Turf Assn.* v. *Greenberg*, 204 U. S. 359; nor do the Thirteenth, Fourteenth and Fifteenth Amendments impair the supremacy of this

power.  *Barbier* v. *Connolly*, 113 U. S. 27; *Hodges* v. *United States*, 203 U. S. 6.

Parks are not instruments of government; neither can the Federal Government exercise within the limits of a State any power or authority which is not incident to some power delegated to the Federal Government.  *Kohl* v. *United States*, 91 U. S. 367; *United States* v. *Fox*, 94 U. S. 315; *Van Brocklin* v. *Tennessee*, 117 U. S. 151; *Cherokee Nation* v. *Southern Kansas Railway*, 135 U. S. 641; *Shoemaker* v. *United States*, 147 U. S. 282.

Even if the Federal Government had authority to make any regulations, they must be police regulations, and cannot be valid unless it appear from their face that their enactment was for the protection of the health, safety, or comfort of the public.  These rules are unwarranted and arbitrary prohibitions, and as such are unreasonable and void.  *Hume* v. *Laurel Hill Cemetery*, 142 Fed. Rep. 552.

*Mr. Assistant Attorney General Harr* for appellee:

The regulations and action taken for their enforcement were authorized by law.  Act of October 1, 1890, § 2, 26 Stat. 650.  They were reasonable, and necessary, and were promulgated to save the Park.  *United States* v. *Shannon*, 151 Fed. Rep. 863; Act of June 6, 1900, 31 Stat. 618.

The United States has all the rights that inhere in sovereignty, consistent with the Constitution for its preservation and protection and the furtherance of its ends.

The rights and powers of the United States over the public lands within the limits and general jurisdiction of a State are very different from those of an individual proprietor.  The individual must look to the State for the punishment of trespassers upon his property, but the United States is not dependent upon the state governments for such protection.  It may itself prohibit and punish trespasses upon the public lands.  *Jourdan* v. *Barrett*, 4 How. 168; *Gibson* v. *Chouteau*, 13 Wall. 92, 99.

Congress has made it offenses or trespass against the United States to cut timber on the public lands, §§ 2461, 5388, Rev. Stat., as amended by act of June 4, 1888, 25 Stat. 166; Act of March 3, 1875, c. 151, 18 Stat. 481; *United States* v. *Cleveland Cattle Co.*, 33 Fed. Rep. 323; and see, as to power of the Government, *Debs Case*, 158 U. S. 564; *Ex parte Siebold*, 100 U. S. 371, 395; *In re Neagle*, 135 U. S. 1; *Camfield* v. *United States*, 167 U. S. 518, 525.

The power of the Federal Government with respect to its property in the States is analogous to the police power of the States. *Light* v. *United States*, 220 U. S. 506, 537.

To hold that the Federal Government is without power to protect the Government lands in the Yosemite National Park, by imposing a reasonable restraint upon the action of owners of private lands within the Park, is to make the rights and interests of the United States dependent upon state action, which is contrary to the supremacy of the Federal Government asserted in the Constitution. *McCulloch* v. *Maryland*, 4 Wheat. *422; *United States* v. *Gettysburg Ry. Co.*, 160 U. S. 668.

The Federal Government may condemn land within a State for the purpose of establishing a national park, and also has the power to set aside and reserve its own lands for such a purpose. It has the constitutional authority to regulate the use of private lands within the Park so as to prevent injury to the public lands and the defeat of the objects in view.

There is no difference in principle between the appellant's lands and the toll roads in respect to the authority of the Federal Government to control their use so far as necessary for the proper protection of the park lands. Whether such roads, having been constructed under the authority of Section 2477 of the Revised Statutes are mere easements, as has heretofore been held (21 Land Dec. 351, 354; *Smith* v. *Townsend*, 148 U. S. 490, 498), or

whether the fee has passed out of the United States, is immaterial. The United States has as much, if not greater, right to regulate the use of such roads for the protection of its own lands, as it has lands owned by private individuals within the Park.

Appellant is not entitled to the aid of a court of equity as the record shows that he has willfully permitted his cattle to trespass upon the park lands.

Mr. Justice McKenna delivered the opinion of the court.

This suit was brought in the Superior Court of Tuolumne County, State of California, against the appellee, Benson, and others, who were soldiers under Benson, to enjoin them from driving appellant's stock from his lands or by any means interfering with them, and from preventing appellant driving his stock to his lands over certain toll roads. The case was removed to the United States Circuit Court for the Northern District of California where, after hearing, final judgment was rendered dismissing the bill of complaint.

The facts as agreed to, and established by evidence supplementing the agreement, are as follows: Appellant is the owner of certain lands within the Yosemite National Park (the Park was regularly and legally established, Act October 1, 1890, 26 St. 650, c. 1263; Joint Res. June 11, 1906, 34 St. 831) and lessee of other lands therein. Leading to the lands there are certain toll roads, which were established many years prior to the creation of the Park.

Appellee Benson is a captain in the United States Army and Superintendent of the Park, and, as such, it was and is his duty to enforce the rules and regulations prescribed by the Secretary of the Interior for the government of the Park, and for this purpose he has a body of troops under his command.

The Secretary established and promulgated the following rules:

"9. Owners of patented lands within the park limits are entitled to the full use and enjoyment thereof; such lands, however, shall have the metes and bounds thereof so marked and defined as that they may be readily distinguished from the park lands. Stock may be taken over the park lands to patented lands with the written permission and under the supervision of the superintendent.

"10. The herding or grazing of loose stock or cattle of any kind on the Government lands in the park, as well as the driving of such stock or cattle over the same, is strictly forbidden, except in such cases where authority therefor is granted by the superintendent."

Appellant claims the right, without complying with these rules, to drive his cattle over the toll roads and to graze them on his lands. On one occasion appellant placed cattle on his lands, and appellee Benson immediately removed them, and refused to allow them to be grazed thereon until appellant complied with the rules; and, prior to the commencement of the suit, refused to allow appellant to drive his cattle over the toll roads to his lands or to use the lands until he complied with the rules.

The testimony gave some particularity to the facts as agreed to. It appeared that appellant has within the Park a few hundred acres, and, it may be inferred, 23,000 acres in the vicinity. He asserted that he had not complied with the regulations, and did not intend to do so until required. And it was admitted that the largest part of the land was unfenced.

The following from the report of the Superintendent of the Park to the Secretary of the Interior for the year 1901 was put in evidence: "After due consideration, based upon the best evidence I have been able to obtain, I can

see no objection to property owners and those holding leased land within the park limits grazing cattle near their own premises under the supervision of the park authorities."

Testimony was introduced on the part of appellees (their counsel expressing a doubt of its admissibility) "to show [that] the regulation is a reasonable one, and the reason for it, and what effect will be produced if the regulation is not carried out." To the offer counsel for appellant replied that he denied the power of the Secretary. "It is simply a question of his power," he said, and stated that if defeated on that point he could show that the rules were not reasonable under the circumstances. The court, saying that it understood, heard the evidence, which was to the following effect: Appellee Benson had been Superintendent of the Park since April 10, 1905, and on duty there for several years prior to that time. Numerous people claimed land in the park as their ranges, and a number of them had the places surrounded by fences, "sometimes enclosing instead of 160 acres which they had as high as several thousand acres of land." They drove their cattle to the so-called ranges and immediately let them loose, and they strayed throughout the entire reservation. "Senator Curtin's cattle have been in that condition for a great many years." This he (Benson) knew of his personal knowledge, because he was present at the time and had a correspondence with Mr. Curtin as far back as 1895, 1896 and 1897. He further testified that he was detailed on special duty to ascertain private land claims in the Park, the object being to ascertain who owned land "and somewhere about where it lay;" that he did some surveying and found that a great many people—"Mr. Curtin, for instance"—had fenced more land than they were entitled to, had paid no attention to their own lines, had tracts of land inclosed upon which their cattle did not stay for more than three or four

days, "but proceeded out to the rest of the park, so a regulation was ordered that they point out their metes and bounds, for this reason: though we might know absolutely where they were," they would claim the cattle to be on their lands. If the metes and bounds were fixed by an "agreed understanding" it could be definitely known whether they were within or without the claim. He further testified that the whole place had been overrun with cattle, and that the object of the regulations was "to keep people to the use of their own land and keep the Government land from being interfered with." He did not attempt to prevent Curtin from using his land, provided he complied with the regulations, but he did remove cattle from Curtin's land on the ground that he had not complied with the regulations.

He testified further that he permitted Curtin to pasture his cattle on his land after he (Curtin) had it surveyed, but refused Curtin permission to fence according to the survey, the correctness of the survey being disputed.

It is objected by the Government that appellant is not entitled to the relief he prays because he does not come into court with clean hands. It is urged as a ground of the charge that the testimony exhibits his purpose to be to use his lands as a basis, and the toll roads as a means, to make wholesale trespasses upon the park lands. If the fact were established it might be hard to resist its effect, but it is not established. The evidence cited in support of it, and of which we have given the substance, refers to a period anterior to the time when this controversy arose. Indeed, anterior to the time when the regulations were established by the Secretary of the Interior, which was April 22, 1905, and the object of the testimony was to account for the regulations, and not to show the special and immediate justification of Benson's orders. We cannot now extend the evidence beyond the special and limited purpose of its introduction. We do

not think the case, as it was submitted to the Circuit Court, showed the ulterior purpose on the part of appellant to be a wilful trespass upon the lands of the Park, but to be an honest assertion of rights.

On the merits of the case we may concede, *arguendo*, as contended by the appellees and disputed by appellant, that the United States may exercise over the Park not only rights of a proprietor but the powers of a sovereign. There are limitations, however, upon both. Neither can be exercised to destroy essential uses of private property. The right of appellant to pasture his cattle upon his land and the right of access to it are of the very essence of his proprietorship. May conditions be put upon their exercise such as appellees put upon them? In answering the question we shall assume, for the time being, that Benson has interpreted correctly the regulations of the Secretary of the Interior. His (Benson's) order is not, it will be observed, a regulation of the use of the land, as an order to fence the lands might be, but is an absolute prohibition of use. It is not a prevention of a misuse or illegal use but the prevention of a legal and essential use, an attribute of its ownership, one which goes to make up its essence and value. To take it away is practically to take his property away, and to do that is beyond the power even of sovereignty, except by proper proceedings to that end.

A law requiring an owner in appellant's situation to fence his land might be within such power, though of that we are not required to express an opinion. A law making the trespass of his cattle on other lands a criminal offense might be within such power. Such laws might be considered as strictly regulations of the use of property, of so using it that no injury could result to others. They would have the effect of making the owner of land herd his cattle on his own land and of making him responsible for a neglect of it.

We have assumed so far that Benson has exercised a

power in accordance with the rules prescribed by the Secretary of the Interior. This, however, may be questioned. The orders of Benson are not that Curtin mark and define his lands, but that he do so "by an agreed understanding" with him (Benson), so that there could be no subsequent controversy about their boundaries. But this gives to Benson power to force a concession to his "understanding" and to require Curtin to submit to a limitation of the area of his land or a limitation of its uses. It is no answer to say that the power would not be arbitrarily or unreasonably exercised. It must be judged by what can be done under it, not by what may be done under it.

It may be doubted, too, if the rules prescribed by the Secretary of the Interior warranted Benson's order in regard to the toll roads. The rules did not deal with the toll roads at all. They do deal with "park lands" and authorize stock to be taken over them by the "written permission and under the supervision of the superintendent." But even if it be held to apply to the toll roads, it is manifestly but a regulation of the transit of the stock merely, and not a use of the roads as a condition of the performance of something else.

We, however, rest our decision on the ground of the want of power of the Secretary or the superintendent to limit the uses to which lands in the Park held in private ownership may be put.

*Decree reversed and cause remanded for further proceedings in accordance with this opinion.*