Howky, J.,
dissenting:
The cause of action arises out of the authorized acts of certain officers and agents of the defendants in so improving the channel of the Mississippi River as to take the certain lands described in the petition of the plaintiffs for public purposes and use. The importance of a right determination of the issues can not well be overestimated.
In so far as plaintiffs are concerned, a result adverse to the right to recover can neither be depreciated nor underrated because, when it shall be determined, if at all, that their land has not been appropriated for public use, and consequently has not been taken within the meaning of the fifth amendment to the Constitution, then these plaintiffs will be effectually deprived of rights of property so valuable to them as to have accomplished their ruin.
The private right involved, important as the result must be to that right, can not be compared, however, to those larger questions disclosed on the face of the record as to whether the acts of the Government affecting these lands, and other lands similarly situated, amount to a taking of property for which compensation, should be made, or whether these acts resolve themselves into a question of consequential injury only, for which damages can not lawfully be awarded.
*624 The findings establish that the lands for whose taking compensation is asked are located within the limits of a narrow strip of country in the Homochitto Basin, on the left bank of the river, 40 railes below Natchez, Miss., and 25 miles above the mouth of Bed Biver, and between the Mississippi Biver and the highlands east of it between Vicksburg and Baton Bouge. This basin has an average width of 2 miles. The bluff behind the lands is known as the foothills, and is being used as the only obstruction to flood waters, and serves the purpose of levees, leaving to flood invasion the lands fronting the river in the basin. The reason of the Government for refusing to build levees on the basin banks of the river grew out of the fact that the cost of building levees within that basin was greater than the value of the lands which such levees would protect. The frontage of the lands along the river in that basin is so short that the back water of floods entering through the opening left at the lower end for local drainage of the basin will reach to the inner foot of the levee and submerge nearly if not all of the inclosed land. The complete reclamation of the lands in this basin is only practicable by treating them as polders and establishing an artificial drainage by pumps and floodgates. The surveys of the Government confirm and prove that the cost of the levees “in most cases” would exceed the value of the land. The foothills back of this basin were near enough to serve the purposes of a levee line in times of high water.' For these reasons the Government did not construct any levees in that district known as the basin.
The Mississippi Biver Commission suggested three ways of dealing with the problem of protecting these lands or compelling the owners to abandon them, to wit: (1) To aid the owners of the inundated lands in building levees; (2) to compensate the owners in damages for their injuries; and (3) to buy the lands and devote them to forestry.
The lands in suit have been subject to overflow since 1828 from the river. In periods of overflow a deposit of silt and sand has been precipitated during seasons of high water, but the water quickly passed off. The private levee on the Jackson lands saved the property from overflow in 1899 and *625 1904. The overflow, of the lands caused by the progress of the Government work brought heavier deposits to the land, and the effect of the frequent and successive overflows beginning in the year 1906 and extending through 1909 was to drive away the tenants, cover 1,700 acres with sand and silt deposits from 6 inches to 6 feet in depth; to cause the land to grow up with weeds, young willows, and cottonwood from 6 to 15 feet in height; and to lift from their foundations and wash into the fields many of the buildings, houses, and cabins formerly on the lands, and to cany away the flooring from these houses and fencing on the land through the action of the swift currents of the water so that the lands have been destroyed for agricultural purposes and have no market value.
The work of levee improvement continued to June 30,1910. The Mississippi River Commission up to that time had allotted to levees nearly $28,000,000. The commission had closed what is known as the Bougere crevasse, opposite the lands named in this case. That crevasse had remained open from 1859 until 1902 or 1903, since when it has been practically closed to a point near the mouth of Red River by the improvements on that side of the river, the effect of which has been to throw the water back onto the lands described by the petition in this case. The levee closing the crevasse was 29 miles in length and 23 feet in height, furnishing a continuous line of levee opposite the Jackson lands. The effect of the closure in times of flood is to produce an increased flood stage of about 4 feet of water on the Jackson lands in addition to the increased elevation of 6 feet in the flood height. The levee opposite the lands here named was constructed by authority alone of the United States.
By closing the natural outlets along the river the overflows from the waters of the Mississippi occurred at such frequent intervals and remained for such a long duration of time, the land has become useless because of the heavy deposits of sand.
Before the Government undertook improvements on the west bank of the Mississippi River opposite the land of these plaintiffs, levees sufficiently high and strong to hold *626 tbe flood waters in the channel of the river had never been built. Consequently, in periods of overflow the water remained for a short time only on the Jackson land, escaping through “ the natural outlets and crevasses into the basins and from said basins into the Gulf of Mexico.” The outlets and drains provided by nature were such as to accommodate the flood waters, and the lands of these plaintiffs were not ■overflowed as frequently before, the outlets were closed by the levee construction of the United States, “ and, consequently, were but little injured by the overflows.”
But the effect of the adoption of the foothill levee line was to keep the lands between the new levee line and the river submerged too long to enable the owners to cultivate the land.
The plan of the United States was to increase the velocity and scouring power of the water and to deepen the channel of the Mississippi River for two purposes: (1) To improve the river for navigation, and (2) reclaim and to protect the land on the west from overflow in times of high water.
Thus to reclaim and protect the land on the west bank of the Mississippi the Government has dispossessed plaintiffs from their land on the east bank.
The issues are strictly issues of law and can not properly be determined without keeping closely in view the findings and their effect upon the rights of the parties.
The findings import verity. They must be accepted as true in obedience to the rule of the Supreme Court, from which there can be no departure without abrogating the rule itself. The appellate court will refuse to look elsewhere for the facts except as they appear in the findings and official reports of which judicial notice will be taken and not in the opinion of my brethren of the majority.
The majority here is of opinion that the Mississippi River Commission has not adopted as the main channel of the river from Vicksburg to Baton Rouge the lands between the levees on the west and the highlands on the east, because of “ an utter absence of any such express intent found in the numerous reports of the commission; ” and it is suggested in the principal opinion that the adoption of the line suggested should be proven “ from living witnesses ” because “ the intentional taking of a vast acreage of land is a transaction *627 too solemn to depend for adjudication upon indistinct and recommendatory reports when the transaction itself is so clearly susceptible to positive proof.”
The “intent” is not in issue, and what the Mississippi Eiver Commission “intended” is not material. What the commission did and the effect of what it did is material. If the intention of an official body be material enough to be made an issue living witnesses could not be heard to prove the intention except by stating what others did, not what they thought.
The material thing, then, to be considered is what the findings show on this point, though it does not seem to me to be very material to state anything about it in view of the fact that it appears from the comments of the majority of the court that the Mississippi Eiver Commission did officially report as the main channel of the river the lands between the levees on the west and the highlands on the east. If this is not the “adoption” of a plan it is nothing. It was the adoption of plan enough to destroy the lands of these plaintiffs.
As the findings are agreed to by the plaintiffs and the Attorney General, the matter of the “ adoption ” of the foothills as the permanent levee line of the river is the only subject matter of difference between the parties on the facts. The “ adoption ” being something in the nature of a conclusion, the specific findings must settle any differences on this matter if it be of any importance.
Finding XI shows that the extension of the general levee system since the United States adopted its use and assumed “permanent control” of the levees has resulted in an increased elevation of general flood levels, thereby subjecting plaintiffs’ lands to deeper overflow than they were subjected to formerly or would be subjected to now if the levee system was not in existence and consequently has destroyed the value of the lands for agricultural purposes caused by the abandonment since 1908. Taking the findings altogether and with knowledge of the fact that the old and broken pieces of levees were taken by the Government and' connected together and new levees built and the new and the old works were strengthened and that the works are now in *628 that condition, it may fairly be stated that the line suggested and in actual use has been adopted by the Government.
The case does not involve any question of immeasurable responsibility either in law or in fact, because: (1) The Government of the United States does not undertake public work beyond its resources. (2) There is nothing in proof to indicate or to justify the court in inferring that the pecuni-ury responsibility of the Government is without its present ability to pay. (3) Immeasurable responsibility arises for remote and consequential damage and where the consequences of improving navigation in the interest of commerce between the States are of such overwhelming character as restrains the Government from undertaking public work so momentous as to make impossible the exercise of the right to improve. That is not this case. The matter before the court is unlike any class of cases (or, for that matter, unlike any one case) where it appeared that the object of the work was merely to preserve the conditions created by natural causes. (4) Though the property is no longer valuable to the owners because it can not be used for agricultural or grazing purposes, nevertheless the lands are capable of growing many kinds of valuable timber and can be made to produce material for revetments and other work necessary to improve the natural channel of the river.
While the market value of the lands has been destroyed and they are no longer useful to the owners or to anyone at the present time, they have yet a prospective and speculative value in that the future may prove the property of considerable value to the United States. This prospective value, it is true, is in the indefinite future and necessarily depends upon the growth of timber. When the conditions as to value are met as the consequence of the timber growth, the Government as the rightful owner will have to its credit something for what it ought now to pay. But if it be speculation merely as to whether in time the lands will become valuable, the reason is not diminished for extending compensation for a taking that may be everlasting and for which taking the present owners are without remedy except as provided by law.
*629 As a matter of common knowledge, appearing from the public records and from the files of this court and estimates probably appearing in the official reports of the Mississippi Fiver Commission, there are plantations destroyed by the character of the improvements of the Government exceeding but little over 100 farms and the whole body of land thus taken being not worth probably over $1,000,000. From the sources of the great river to its mouth similar conditions .do not exist (and probably never will exist) elsewhere.
Federal power over commerce among the several States is broad enough to enable the legislature to carry out one of the great objects of our Union. This was long ago settled in Gibbons v. Ogden, 6 Wheat., 204, and was accompanied with the statement that this power “ is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution.”
But the Supreme Court never meant to say, nor did it imply, that the power to improve may be exercised to such an extent that public work may be undertaken and carried on without compensation to the citizen owner where his property has been taken for the benefit of the public. The exercise of the power to the “ utmost extent ” is accompanied by, and goes hand in hand with, the fifth amendment, which prescribes limitations on the power to improve navigation unless means enough are used to pay such owner when public •exigencies dispossess him of his property.
When it shall be held by courts that the Government can constitutionally spend millions in carrying water to lands otherwise arid, and when it shall further be held that the appropriation of the lands of one person may be made by the United States in the name of and for the improvement of a river and which incidentally includes protection to the lands of a person on one side of that river without compensation which can not be provided for a landowner on the other side who becomes ousted and merely because of the dread of large responsibility, it will be time enough to say, in the language of an illustrious Englishman, that when courts can be influenced by considerations of mere cost, regardless of the protection provided by the organic law for those in the *630 enjoyment of private property, such country is hastening to decay.
Congress adopted the Eads plan, which provided for a continuous line of levee construction from Cairo to the Gulf-Permanent control of the low, insufficient, and disconnected levees, which had been begun by local authorities and in some cases constructed by private landowners, was assumed by the Federal authority. Our tenth finding shows that the general improvement attempted to confine the waters in a narrower channel as the result of the increased elevations of the works on the banks of the big stream. This increased elevation produced more frequent and destructive overflows at all points where the levees were not strong enough to resist the force of the water.
Our twelfth finding shows the active closing of crevasses from year to year; and our thirteenth finding, taken in conjunction with the ninth, shows that, before the joinder of the levee line by the United States (pursuant to the Eads plan) and which made the higher banks as they were constructed continuous, there were occasional overflows of plaintiffs’ lands, but n,ot enough to prevent cultivation. The occasional deluges did not materially damage the lands for grazing and agricultural purposes nor affect their market value. On the contrary, the water (before the final public improvements) which flowed from above — not so much from love of motion as from want of rest — did not remain long enough to submerge the lands so as to prevent the planting of crops. The silt deposits enriched these lands where the water had quick opportunity to escape to a lower level. After the completion of the levee system by the construction of the higher embankments and the general confinement of the flood discharges within a narrower channel, the floods were so frequent as to make the unprotected land continue in a submerged condition too long to make the injury immaterial. These frequent and deeper overflows for the longer period of time had the effect of dispossessing the owners. If this con-, dition did not constitute an actual invasion it is difficult to find a definition of what such conditions did create.
Official reports (Miss. Riv. Com. Rep., 1910, p. 2938) show “perpetual inundation”; want of redress for the sake of *631 improvements to lands behind the levees on the opposite side of the river. The closing of the Bougere crevasse immediately opposite plaintiffs’ lands finished the work of destruction and accomplished their ruin.
The majority of the. court do not say, but assume from some report, that “ it would seem ” that it was not impossible for plaintiffs to have protected their lands from overflow by private levees and embankments, and if so the duty was cast upon them so to do, and if done the damages claimed would be materially minimized, if not fully prevented, citing Manigault v. Springs, 199 U. S., 473.
The sixth finding of the court (adverted to in the principal opinion) does not sustain the assumption. Overflows were in part averted by' the private levee of plaintiffs at times. But the findings also show that when the crevasses opposite plaintiffs’ lands were closed and the work of public improvement was continued to the extent of piling up more earth on the opposite side of the river in the construction of levees and to such an extent as to raise the level of the water in the river as much as 6 feet, private levees were washed away as the result of the public improvements. The owners could no more protect themselves without the sacrifice of the lands to the full extent of their value than could the United States. We have the official report disclosing that it was cheaper to the United States for the owners to abandon the lands and be compensated by the Government than for the United States to build levees. Especially is this report to be taken as true when, as the result of Government work, the findings show that the private levees had been washed away. If it was more profitable for the Government to pay for these lands than to build levees to protect them it necessarily follows that their market value was totally destroyed by the improvements.
Private levees could not have been reconstructed to prevent the floods by plaintiffs in the case before the court for the obvious reason that such levees as plaintiffs had ever put on the property were next to the river on lands owned solely by the plaintiffs. They were without power to build levees above their own lands for want of ownership.
*632 The case of Manigault v. Springs, supra, merely decides that when an owner is put to additional expense in warding off the consequences of an overflow there can be no recovery; but where there is a practical destruction or material impairment of value of lands by overflowing them as the result of the construction of dams there is a taking which demands compensation. No amount of expenditure would have availed these plaintiffs to have saved their lands.
The question resolves itself into the difference between consequential damages and a taking of private property for public purposes. Only three cases are cited in the majority opinion which seem to have any bearing upon this one issue in the case.
In Transportation Co. v. Chicago, 99 U. S., 635, there appeared to be an impairment of the use where the acts done did not directly encroach upon property of a private nature. But Findings VI, XI, and XVIII in the present case establish encroachment upon the lands of such character as to destroy. The superinduced additions of water, sand, and silt proved to be permanent deposits to the extent of burying the lands in mud and annihilating value as to compel abandonment of the property.
In Gibson v. United States, 160 U. S., 269, it appeared that there was no taking, no destruction, and no consequence except damage arising out of alleged inability to use a landing for the shipment of products from and supplies to a farm for the greater part of the gardening season. There was no water thrown back on the land. The Government neither attempted nor assumed to take private property. Subsequently, in United States v. Welch, 217 U. S., 333, an award was sustained for destruction of a right of way and also for damages to property destroyed for public purposes. Such “ destruction for public purposes may as well be a taking as would be an appropriation for the same end,” so the court said.
In Bedford v. United States, 192 U. S., 217, damages were claimed as the result of “ revetments to prevent erosion of the banks from natural causes.” But revetments did not change the natural course of the river. Said the learned *633 judge, wbo delivered the opinion of the Supreme Court in the Bedford, case, “ There was no other interference with natural causes. ” The damage to the land, if any damages could have been assigned to the works at all, was but “ incidental consequences ” of something which the Government-had the right to do.
If on the side of the revetments and above on the banks a levee had been erected there would have been obstruction of the flow of the water. The revetments shown to have been constructed in the case of Bedford were placed below high-water mark. The purpose of revetment is to prevent erosion by the waters to high-water mark but not above. The purpose of a levee is to obstruct the flow of water, which in many cases either increases or causes erosion. The purpose in the present case in the construction of a levee was (and its effect was) to obstruct the flow of water when it should get above the high-water mark and not below that mark. Revetment work is entirely submerged when there is enough water in a river to reach a levee placed on top of the bank. The objects of revetment work and a levee are entirely different and serve distinct purposes.
The seventh finding in the case of Bedford discloses that “ the revetment did not change the course of the river as it then esisted, but operated to keep the course of the river, at that point, as it then was, * * * and the injury done to the claimant’s land was the effect of natural causes.” In the case at bar natural causes had never occasioned injury to plaintiffs’ lands and injuries would never have been occasioned hut for an interference with natural conditions.
From 1828 to the time when the Government by its works threw upon plaintiffs’ lands volumes of water and destroyed the attribute of ownership plaintiffs were able to cultivate their lands. Since then periodical overflows have been precipitated so as to deprive them of the use. The findings establish the permanent character of the taking and bring the present case within that of Pumpelly v. Green Bay Co., 13 Wall., 166, and that of United States v. Lynah, 188 U. S., 459. In the latter case the works were constructed in the bed of the river and obstructed the natural flow of its water, *634 and as a direct consequence caused the overflow of Lynah’s plantation. That is precisely the condition in the case now before the court, except that instead of the works being placed in the bed of the river they were placed on the banks of the river, and the consequence of the one is as direct in the case at bar as the consequence was in Lynah's ease. The case of Williams v. United Slates, 188 ib., 485, following Lynatts case, shows a similar taking. The just compensation provided by the Constitution for such taking and guaranteed obviously “ requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel or single tract of land shall be measured by the loss.” Grizzard v. United States, 219 U. S., 180.
There are limitations upon the power not only of the rights of the Government where it is a proprietor, but likewise limitations upon its powers as a sovereign. Such limitations as to either the proprietary right or the authority of government as a sovereign operate to prevent the exercise of either right so as to destroy the essential uses of private property. Said the Supreme Court: “ To take away the essence and value of property without compensation is practically to take property and this is beyond the power even of sovereignty except by proper proceedings to that end.” Curtin v. Benson, 222 U. S., 78.
It will be observed that in the present case there was no necessity for the river to be scoured. (That, however, makes no difference, even if that necessity existed.)
The Mississippi River Commission made the foothills serve the purposes of a levee line compelling the water to return to the channel in times of high water. They state that in their report. And this statement is accompanied with another having as I see it a great bearing in the settlement of the issues. The commission said that the construction of levees was not important for the improvement of the river for navigation. We know that the channel of the river was not improved for purposes of navigation, because vessels of the greatest draft could float upon the bosom of the flood tides. It nowhere appears that the river was not deep enough at any time to be navigated after the subsidence of the flood *635 waters. It is evident that the levees were raised in excess of 20 feet to protect the lands on the west side of the river from overflow. The consequences of the general confinement of the flood discharged by the levee “ as a whole ” had the effect of driving plaintiffs away.
Another fact must not be overlooked. Before the crevasse, known as the Bougere crevasse, occurred, as far back as 1859, the bank did not obstruct the high-water flow. This bank did not extend from 3 to 5 feet above the highest known water, as do the levees completed by the United States. Formerly, in times of flood, water went over the bank, and it was the overflow of the river’s bank which caused the crevasse. The record discloses that until 1890 there were only two serious overflows, one in 1882 and another in 1884. But even in those years the water went off in time to make a crop.
Many of the cases relating to the rights of riparian owners do not involve the question of obstruction of the natural flow of flood waters. But there are many cases highly persuasive which do deal with the question now before the court. In the early case of Rex v. Trafford, 20 Eng. C. L. R., 498, Lord Chief Justice Tenterden said that—
“ It has long been established that the ordinary course of water can not he lawfully changed or obstructed for the benefit of one class of persons to the injury of another. Unless, therefore, a sound distinction can be made between the ordinary course of water flowing in a bounded channel at all usual seasons, and the extraordinary course which its superabundant quantity has been accustomed to take at particular seasons the creation and continuance of these fenders can not be justified. No case has been found that will support such a distinction.” ‘
Though Trafford v. Rex was reversed because the facts in the case did not warrant a special verdict, the reversing court agreed in the principle laid down by the Court of King’s Bench, 21 Eng. C. L. R., 272.
There are very many cases which show the right to have a stream flow as it is wont by nature, which includes the right to have the water flow off from one’s premises as it is accustomed to do, and this right “ is property.”
*636 There are also very many cases which show that where woiks are constructed below the land of a proprietor, such as a bridge or culvert or dam, or alteration of the channel, which cause the water to set back and overflow the land of such proprietor, there is a violation of such right and, if the works are authorized by law, there is a taking for which compensation must be made. The books are full of cases to this effect and may be found summarized in 1 Lewis’ Eminent Domain, sec. 80, p. 90, 3d ed. What possible difference can there be between cases like these and cases where works are constructed on one side of a river to the destruction of an owner’s land on the other side of the stream?
The doctrine of damnum absque injuria can have no appli- ■ cation here, because that principle is only applicable for “ those unexpected visitations whos.e comings are not foreshadowed by the usual course of nature and must be laid to the account of Providence, whose dealings, though they may afflict, wrong no one.” Pittsburgh R. R. Co. v. Gilleland, 56 Pa. St., 452; O'Connell v. East Tenn. Ry. Co., 87 Georgia, 261.
Barney, J., concurs in this dissent.