No. 86-392

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

WESTERN ENERGY COMPANY,
a corporation,

          Plaintiff and Appellant,

    -vs-

GENIE LAND COMPANY, a corporation,
and MONTANA DEPARTMENT OF STATE
LANDS, an agency of the State of
Montana,

          Defendants and Respondents.

_____

APPEAL FROM:  District Court of the Sixteenth Judicial District,
               In and for the County of Rosebud,
               The Honorable B. W. Thomas, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Moulton, Bellingham, Longo & Mather; W.H. Bellingham
        argued, Billings, Montana

    For Respondent:

        Goetz, Madden & Dunn; William L Madden argued, Bozeman,
        Montana
        John F. North argued, Dept. of State Lands, Helena,
        Montana

    For Amicus Curiae:

        Holland & Hart; Paul D. Miller argued for Meridian
        Minerals, Billings, Montana
        Daniel C. Murphy, Meridian Minerals, Englewood,
        Colorado

_____

Submitted:  March 19, 1987

Decided:  May 22, 1987

Filed:    MAY 22 1987

*Ethel M. Harrison*
_____
                Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The District Court of the Sixteenth Judicial District in and for Rosebud County, Montana, denied the request of Western Energy Company (Western) that Genie Land Company (Genie) and the Montana Department of State Lands (MDSL) be enjoined from denying it the right to obtain a coal strip-mining permit and the right to enter upon lands in order to strip-mine coal without further consent or waiver from Genie. The court also refused to declare § 82-4-224, MCA, unconstitutional. Western appeals to this Court. We hold the statute unconstitutional and reverse and remand.

By deed dated September 4, 1945, Northern Pacific Railway Company (NP) granted to Philbrook Land and Livestock Company (Philbrook) 6,768.18 acres of land in Rosebud County, Montana, which included:

W½W½NE¼; NW¼; N½SW¼; NW¼SE¼ Section 29, Township 2 North, Range 42 East; M.P.M.

By deed dated April 15, 1947, NP granted to Philbrook 650.92 acres of land in Rosebud County, Montana, described as:

Lots 1, 2, 3 and 4, E½W½; NE¼; SW¼SE¼, Section 19, Township 2 North, Range 42 East; M.P.M.

The land described in the 1945 and 1947 deeds include the subject lands, comprising approximately 840 acres.

Both the 1945 and the 1947 deeds contained pertinent exceptions and reservations that provided:

[E]xcepting and reserving unto the grantor, its successors and assigns, forever, all minerals of any nature whatsoever, including coal, iron, natural gas and oil, upon or in said land, together with the use of such of the surface as may be necessary for exploring for and mining or otherwise

2

> extracting and carrying away the same;
> but the grantor, its successors and
> assigns, shall pay to the grantee, or to
> its successors or assigns, the market
> value at the time mining operations are
> commenced or such portion of the surface
> as may be used for such operations or
> injured thereby, including any improve-
> ments thereon; . . .

Burlington Northern Railroad Company (BN) is the successor in interest to NP as to all right, title and interest of NP in the subject property. Genie is the successor in interest to Philbrook as to all right, title and interest in the subject property. Genie is in possession of the surface of the subject lands.

On June 1, 1966, NP and the Montana Power Company (MPC) executed a mining lease of coal lands (coal lease) which has been supplemented from time to time by successors in interest to NP. Western has succeeded to the interest of MPC in the coal lease as supplemented, which covers the subject lands. Section 82-4-224, MCA, the Owner Consent Statute, says:

> Consent or waiver by surface owner. In
> those instances in which the surface
> owner is not the owner of the mineral
> estate proposed to be mined by strip-
> mining operations, the application for a
> permit shall include the written consent
> or a waiver by the owner or owners of the
> surface lands involved to enter and
> commence strip-mining operations on such
> land, except that nothing in this section
> applies when the mineral estate is owned
> by the federal government in fee or in
> trust for an Indian tribe.

The MDSL informed Western that because of the Owner Consent Statute and applicable administrative rules, it would deny Western Energy's application for a permit to strip coal unless Genie Land consented. Western has been unsuccessful in obtaining Genie's consent.

In previous litigation between these parties, this Court permitted Western Energy to conduct various exploration

3

and resource inventory operations on the subject lands, as being a necessary part of the information needed by Western in order to apply for a strip-mining permit. The Court concluded strip-mining was within the contemplation of the parties at the time the deeds were conveyed. Further it was the understanding of the parties that NP withheld the mineral ownership and reserved the right to do what was necessary to extract minerals. Western Energy Co. v. Genie Land Co. (1981), 195 Mont. 202, 635 P.2d 1297.

Relying on § 82-4-224, the Owner Consent Statute, Genie refused Western the right to enter the land for the purpose of strip-mining, thus foreclosing the possibility of Western's obtaining a permit to mine from the MDSL. Western then sought a permanent injunction enjoining Genie and the MDSL from denying it permission to strip the coal, and requested a declaratory judgment that § 82-4-224, MCA, and the applicable regulations, are unconstitutional under federal and state constitutional due process and impairment of contract clauses. The District Court found the statute constitutional and refused to grant Western injunctive relief, however. Western appeals.

The constitutionality of § 82-4-224, MCA, is dispositive of this case notwithstanding various errors Western claims were committed by the District Court. We find the statute unconstitutional.

Both the Montana and the United States Constitutions prohibit taking of property without due process. Article II of Montana's Constitution provides for protection of property in two sections:

> Section 17. Due process of law. No person shall be deprived of life, liberty, or property without due process of law.
>
> . . .

4

Section 29. Eminent domain. Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner . . .

The Fifth Amendment to the United States Constitution says,

No person shall . . . be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation.

It is incorrect to argue Western does not have a property interest in its leased mineral estate which is protected by the due process clauses.

It has long been established that the holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment, to just compensation for the value of that interest when it is taken upon condemnation by the United States. [Citations omitted.]

Alamo Land & Cattle Co. v. Arizona (1976), 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1, 8-9. See also Foster v. United States (Ct. Cl. 1979), 607 F.2d 943, 949. The Fifth Amendment is applicable to the states through the Fourteenth Amendment. Webb's Fabulous Pharmacies, Inc. v. Beckwith (1980), 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358; Penn Central Transp. Co. v. New York City (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631.

While the principles of eminent domain require just compensation when private property is taken for public use, constitutional due process requirements may be met without just compensation when the state exercises its inherent police power to regulate the health, safety and general welfare of the people.

It is well established that a police power regulation must be reasonably adapted to its purpose and must injure or

5

> impair property rights only to the extent
> reasonably necessary to preserve public
> welfare. The standard of reasonableness
> is the constitutional measure of the
> proper exercise of the police power.

Yellowstone Valley Electric Cooperative v. Ostermiller (1980), 187 Mont. 8, 15, 608 P.2d 491, 496. See also Charles v. Diamond, (N.Y. App. 1977), 360 N.E.2d 1295, 1302.

The statute must serve a public, rather than a private interest and the means chosen to advance the interest must be reasonable. Lawton v. Steele (1894), 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385, 388. In Mountain States Telephone and Telegraph Co. v. Dept. of Public Service Regulation (Mont. 1981), 634 P.2d 181, 187, 38 St.Rep. 1479, 1485, we adopted the Lawton "means end test" wherein the state's authority on behalf of the public is balanced against the constitutional due process requirement in the protection of private property.

A regulation which establishes an unreasonable burden on the landowner is unconstitutional as a violation of due process. If the regulation is invalid, "the proper remedy . . . is a declaration of unconstitutionality." Charles v. Diamond, supra, at 1303.

The Montana Strip and Underground Mine Reclamation Act, §§ 82-4-201 et seq., MCA, was enacted pursuant to the authority granted in the 1972 Montana Constitution, and is "[d]eemed to be an exercise of the general police power to provide for the health and welfare of the people." Section 82-4-202(2)(b), MCA.

Applying the Lawton "means end test" to § 82-4-224, MCA, the Owner Consent Statute, we conclude the denial of just compensation places an unreasonable burden on the mineral owners, in violation of due process. The statute does not bear the requisite "substantial relation to the public health, safety, morals, or general welfare." Euclid v. Ambler Realty Co. (1926), 272 U.S. 365, 395, 47 S.Ct. 114,

6

121, 71 L.Ed. 303, 314. Nor does it address reclamation, conservation, or any other policy goal. It does not prevent strip-mining operations, does not regulate the manner in which mining or reclamation is performed, nor does it conserve agricultural land. The statute merely provides that when the owner of the minerals does not own the surface he cannot apply for a permit to mine without first receiving permission of the surface owner to enter and commence strip-mining operations on the land. The statute is inapplicable unless the surface rights have been severed from the mineral rights, or the mineral estate is owned in fee by the federal government or in trust for an Indian tribe. Thus, any public interest protected by the statute is limited.

The case at bar is analogous to that in Pennsylvania Coal Co. v. Mahon (1922), 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322. In Mahon the Commonwealth of Pennsylvania passed a statute which prohibited mining coal in such a manner as to cause the surface to subside. A deed of the property involved contained a reservation of the right to remove all coal under the land and further provided that the grantee (surface owner) assumed all risks and waived all damages which might arise from mining the coal. The Supreme Court struck down the statute as an unconstitutional exercise of the state's police power "so far as it affects the mining of coal . . . in places where the right to mine such coal has been reserved." Mahon at 414, 43 S.Ct. at 160, 67 L.Ed at 325.

Justice Holmes said:

> So far as private persons or communities have seen fit to take the risk of acquiring only surface rights, we cannot see that the fact that their risk has become a danger warrants the giving to them greater rights than they bought.

Mahon, supra, at 416, 43 S.Ct. at 160, 67 L.Ed. at 326.

The court reasoned it is a natural human tendency to extend the state's police power to protect the public interest until at last private property no longer exists. However, this "public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." Mahon, supra.

The owner consent statute permits a similar occurrence by effectively depriving Western of the right to mine its coal. Mahon makes clear that a taking may arise from an inverse condemnation, where property use or value is interfered with by state regulatory or police action.

> What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it.

Mahon, supra at 414, 43 S.Ct. at 160, 67 L.Ed. at 325. The reasoning in Mahon applies in this case.

Genie contends Keystone Bituminous Coal Association v. De Benedictis (1987), ____ U.S. ____, 107 S.Ct. 1232, 94 L.Ed.2d 472, handed down only days before oral argument in the case at bar, is controlling and dispositive of the constitutional issue here. We do not agree.

In Keystone the Court was asked to find enactment of a Pennsylvania statute unconstitutional as a taking and an unlawful impairment of contract. The Bituminous Mine Subsidence and Land Conservation Act, (the Subsidence Act) was enacted after the Pennsylvania legislature determined the Commonwealth's existing mine subsidence legislation had failed to protect the public interest in safety, land conservation, preservation of affected municipalities' tax bases and land development. A formula which generally required 50% of the coal beneath the protected structures to

8

be left for surface support was applied when enforcing the Act. Petitioners were owners of the mineral estate and had acquired a waiver of any claims for damages which might result from the removal of coal. They brought suit claiming the 50% rule constituted a taking within the meaning of the Fifth and Fourteenth Amendments. They also claimed violation of their contractual rights pursuant to Art. I, § 10 of the United States Constitution. The Court distinguished Mahon, supra, on its facts, and found the Subsidence Act to be constitutional.

We distinguish Keystone for three reasons. The Court in Keystone found that coal mining activity in certain instances was akin to a public nuisance. Therefore the state was not estopped from exercising its police power under the Fifth and Fourteenth Amendments to abate such activity. ____ U.S. at ____, 107 S.Ct. at 1244, 94 L.Ed.2d at 491. We were not asked to, nor can we, characterize strip mining in Montana as a nuisance, thus placing it within the narrow exception which permits a taking in order to prevent "a misuse or illegal use." Such an exception is not intended to allow "the prevention of a legal and essential use, an attribute of its ownership." Supra at 1256, (Rehnquist, J., dissenting) quoting Curtin v. Benson (1911), 222 U.S. 78, 86, [32 S.Ct. 31, 32, 56 L.Ed. 102, 106]. We note, "[i]t is the declared policy of this state and its people to: . . . provide for the orderly development of coal resources through strip or underground mining to assure the wise use of these resources and prevent the failure to conserve coal." Section 82-4-202(1)(g), MCA.

No less significant is the fact the Court has never allowed the nuisance exception to allow complete extinction of a parcel of property. See, for example Mugler v. Kansas (1887), 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; Miller v. Schoene (1928), 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568. There is no "reciprocity of advantage" inherent in

9

§ 82-4-224, MCA. See _Mahon_, supra at 415, 43 S.Ct. at 162, 67 L.Ed. at 326. Consequently, _Keystone_ is distinguishable.

Secondly, we distinguish _Keystone_ because application of the Subsidence Act to all minerals, not merely those which have been severed from the surface estate, reflects a public interest. As noted above, there is limited public interest protected by § 82-4-224, MCA.

Finally, petitioners in _Keystone_ sought to define narrowly certain segments of their property and argued the Act effectively appropriated coal in those segments. The critical question then became how to define a segment of property for taking purposes.

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a partic- ular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature of the interference with rights in the parcel as a whole . . .

_Penn Central_, supra at 130-131, 98 S.Ct. at 2662, 57 L.Ed.2d at 652.

> [W]here an owner possess a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety.

_Andrus v. Allard_ (1979), 444 U.S. 51, 65-66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210, 223. At issue in this case is destruction of Western's entire bundle of rights in the minerals beneath the surface owned by Genie.

The Court in _Keystone_ rejected petitioners' argument that the extent of interference with their property interests should be determined by the amount of coal the Subsidence Act required to be left in place, that being 50%. The Court said the coal left, regardless of the amount, "do[es] not

10

represent a separate segment of property for taking law purposes," characterizing it merely as one strand in petitioners' bundle of rights. _Keystone_, supra, at ____, 107 S.Ct. at 1249, 94 L.Ed.2d at 496.

Genie contends this rejection signals a similar refusal by this Court of Western's claim of total loss of its coal due to § 82-4-224, MCA. Under Montana law, however, Western's entire bundle of rights consists of its rights to all the minerals beneath certain sections of land. These rights are not defined in terms of its various holdings in eastern Montana, but rather in terms of its rights to mine coal in the specific sections in question. Consequently, the Court's determination in _Keystone_ that merely one strand of petitioners' rights had been taken is inapplicable here.

Genie's argument the Owner Consent Statute is not an impairment of contract likewise cannot stand. Both the Montana and United States Constitutions prohibit the impairment of contracts. Article II of the Montana Constitution says:

> Section 31. Ex post facto, obligation of contracts, and irrevocable privileges. No ex post facto law nor any law impairing the obligation of contracts, . . . shall be passed by the legislature.

The United States Constitution says:

> Article I, Section 10. No state shall . . . pass any . . . law impairing the obligation of contracts, . . .

Although the prohibition appears absolute on it face, private contracts must give way before a legitimate exercise of police power. Home Building and Loan Association v. Blaisdell (1934), 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413; Chicago and Alton R.R. v. Tranbarger (1915), 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 204; Atlantic Coastline Railway Co. v. City of Goldsboro (1914), 232 U.S. 548, 34 S.Ct. 364, 58,

L.Ed. 721. Thus all business is conducted subject to the retained power of the state to protect public welfare.

> [A]n examination of the legislation for validity under the contract clause requires a three step analysis. The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of the contractual relationship." [Citations omitted.] If there is no substantial impairment of the contractual relationship, the inquiry is ended. Second, if the legislation substantially impairs the contractual rights, "[t]he state, in justification, must have a significant and legitimate public purpose behind the regulation." [Citations omitted.] Third, the adjustment of rights and responsibilities of contracting parties must be based "[u]pon reasonable conditions" and be "[o]f a character appropriate to the public purpose justifying the legislation's adoption."

Neel v. First Fed. Savings and Loan Assoc. (Mont. 1984), 675 P.2d 96, 104-105, 41 St.Rep. 18, 27, citing Energy Reserves Group, Inc., v. Kansas Power & Light Co. (1983), 459 U.S. 400, 412-413, 103 S.Ct. 697, 704-705, 74 L.Ed.2d 569, 581-582.

"The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them." Blaisdell, supra, at 431, 54 S.Ct. at 237, 78 L.Ed at 425. Section 82-4-224, MCA, impairs Western's right to mine the coal by subjecting it to the vagaries of the surface owner for consent to enter and mine.

Legislation which impairs a contract can be justified only when it serves a legitimate public purpose. The state's police power to invade private rights is limited to legislation which bears a "substantial relation to the public health, safety, morals, or general welfare." Euclid v. Ambler Realty, supra. As noted above, we do not find that § 82-4-224, MCA, meets this standard.

12

Finally, we conclude that the adjustment of the rights and responsibilities of the contracting parties is not based on reasonable conditions and is not of a character appropriate to the public purpose. We concur with the Kentucky Court of Appeals which said, in striking as unconstitutional a similar statute, "the primary effect of [the challenged section is] to change the legal rights and economic bargaining position of many private parties under their contracts rather than achieve any public purpose." Dept. for Natural Resources and Environmental Protection v. No.8 Limited of Virginia (Ky. 1975), 528 S.W.2d 684, 687. The Owner Consent Statute exceeds the legitimate bounds of the state's police powers.

Although we have discussed United States Constitutional provisions, we have decided the issues in this case based upon the Montana Constitution, which provides independent and adequate constitutional grounds. We hold § 82-4-224, MCA, and any rules adopted for implementation thereof, unconstitutional and in violation of the Montana Constitution--specifically, Article II, Section 17, as permitting a taking without due process; Article II, Section 29, as permitting the taking of private property without just compensation; and Article II, Section 31, as permitting the impairment of the obligation of contract.

The judgment of the District Court is reversed with instructions to enter judgment in accordance with this opinion.

Justice

13

We concur:

_L. A. Turnage_
Chief Justice

_Justices_

_The Honorable Russell C._
McDonough sitting in place of
Mr. Justice John C. Sheehy

_The Honorable M. James Sorte,_
Judge of the District Court
sitting for Mr. Justice
Frank B. Morrison, Jr.