No. 03-714

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 341

KERRY PEYATT,

        Plaintiff and Appellant,

   v.

JIM MOORE, and J. MOORE ENTERPRISES, LLC,

        Defendants, Third-Party Plaintiffs and
        Respondents,

   v.

DON REUTER and JOHN DOES I-X,

        Third-Party Defendants.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                In and For the County of Yellowstone, Cause No. DV 2001-1026,
                Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Gregory G. Murphy, Moulton, Bellingham, Longo & Mather, P.C.,
                Billings, Montana

        For Respondents:

                Kevin M. Funyak, Stacey & Funyak, Billings, Montana

                Brenda L. Blazer and Monte L. Rogneby, Vogel Law Firm,
                Bismarck, North Dakota (Third-Party Defendants)

                Submitted on Briefs:  March 31, 2004

                        Decided:   December 3, 2004

Filed:

_____
                   Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Plaintiff Kerry Peyatt (Peyatt) appeals the October 22, 2003, bench ruling of the Thirteenth Judicial District Court, Yellowstone County, granting summary judgment in favor of Defendants Jim Moore and J. Moore Enterprises (collectively, Moore), Peyatt's employer, on Peyatt's claim for breach of duty under the Montana Safety Act (Act). We reverse and remand.

¶2 The following issue is presented on appeal:

¶3 Did the District Court err in granting summary judgment to Moore by holding that the statutory duty to provide a safe workplace did not extend to the out-of-state location at which Peyatt was injured?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4 Peyatt was severely injured on February 3, 2001, in Bismarck, North Dakota, when his arm was torn off in the spinning power takeoff shaft (PTO) of a tractor. At that time, Peyatt was employed by Moore as a truck driver.

¶5 During the summer of 2000, the State of Montana was adversely affected by fires and drought. Particularly hard hit were ranchers in need of hay for their cattle. Then-Governor Marc Racicot indicated that Montana would need over one million tons of hay to help affected ranchers feed their livestock over the coming winter. Montana received a $300,000 federal grant to provide emergency hay to ranchers, which resulted in the creation of the "I Care a Ton" relief program.

¶6     The Montana Department of Agriculture contracted with the Montana Farm Bureau Foundation (MFBF) to handle the administration of the federal grant and day-to-day activities of the "I Care a Ton" program. The contract between the Department and the MFBF stated that the purpose of the program was to "organize, coordinate, supervise, and purchase transportation services" to ship emergency hay to Montana producers affected by fire and drought. To locate hay to be donated to the program, the MFBF placed advertisements within the media of Montana and surrounding states. Those ads requested that interested parties call the MFBF, which would then work with the donor on the specifics of the donation. Once the details were worked out with the donor, MFBF would forward this information to a transportation provider to pick up and deliver the hay. The MFBF would advise donors that they would need to make arrangements for the loading of the hay on the transport trucks.

¶7     Many North Dakotans were willing to help Montana in this emergency in light of the help Montana ranchers lent to North Dakota three years earlier in 1997 when North Dakota lost over 100,000 head of livestock during a spring blizzard. Montana ranchers responded by donating hundreds of cows through the "One Good Cow" program to help North Dakota ranchers rebuild their herds.

¶8     Don Reuter (Reuter), a North Dakota farmer, contacted the MFBF regarding his desire to donate hay through the "I Care a Ton" program. The MFBF reached an agreement with Reuter wherein the donated hay would be picked up at Reuter's property in North Dakota and then be delivered to a destination in Montana. To facilitate that agreement, the

3

MFBF contracted with Moore to provide transportation services. The contract between the MFBF and Moore stated that Moore was to "provide commercial transportation services to haul hay." In short, Moore was to supply the necessary truck, trailer and equipment, and Reuter was to arrange for loading the hay. The MFBF gave Moore directions to Reuter's property in North Dakota. Moore then dispatched Peyatt, who was employed by Moore as a truck driver, to pick up the load of donated hay and deliver it back to Montana.

¶9     When Peyatt arrived at Reuter's farm, Peyatt positioned the trailer and prepared for the hay to be loaded by Reuter. Reuter was using machinery borrowed from a neighbor to load the hay onto the truck. In the process of loading one of the bales of hay, the tractor being used by Reuter became stuck in some snow, according to Peyatt's testimony, some thirty feet away from the truck and trailer. Reuter left the tractor, which was still running with the PTO engaged and spinning, to get his personal pickup to pull the tractor out. Reuter backed his pickup close to the tractor and pulled a chain out to hook between the tractor and his pickup. In an attempt to assist Reuter, Peyatt took one end of the chain and bent down to hook that end to the tow bar at the back of the tractor. As Peyatt attempted to hook the chain to the tow bar, his coat became entangled in the PTO shaft. Peyatt was maimed when his arm was torn off in the spinning mechanism.

¶10    For reasons unstated in this litigation, Moore was deemed not to have workers' compensation insurance, and, as an uninsured employer, was subjected to suit for Peyatt's injuries pursuant to § 39-71-508, MCA, and was prohibited from raising certain defenses, such as the employee's negligence, pursuant to § 39-71-509, MCA. Thus, the issues herein

4

arise in the context of a work-related injury for which there was no workers' compensation coverage.

¶11 On December 19, 2001, Peyatt brought suit against Moore, raising claims under the "Montana Safety Act" (Act), § 50-71-101, MCA, *et seq*., asserting that, while in the scope and course of his employment as a truck driver for Moore, he suffered severe injuries as a direct result of Moore's failure to: (1) provide him with a safe place to work; (2) adopt and use practices, means, methods, operations and processes that were reasonably adequate to render his place of employment safe; and (3) do any other thing reasonably necessary to protect his life, health, and safety. Moore responded by filing a third-party complaint against Reuter and other unknown potentially liable parties which may have caused or contributed to Peyatt's injury.

¶12 Moore then moved for summary judgment, arguing that because Moore lacked control over the location where Peyatt's injury occurred–that is, Reuter's farm–that location did not constitute a place of work or employment under the Act, and therefore, Peyatt's claims failed as a matter of law. In a bench ruling at the hearing on summary judgment, the District Court granted Moore's motion for summary judgment. The District Court stated that although the Act does not define "place of employment," it must be one which is controlled by the employer, or over which the employer has the right to exercise control. The District Court stated that Peyatt's place of employment was the truck, and not the loading environment at Reuter's farm. The District Court ruled that since Reuter's farm was not Peyatt's

"workplace," Moore could not have breached the duties upon employers imposed by § 50-71-201, MCA, to provide a safe workplace for employees. Peyatt appeals.

## STANDARD OF REVIEW

¶13 Our standard of review on appeal from summary judgment is de novo, and we apply the same criteria as the district court based on Rule 56, M.R.Civ.P. *Fisch v. Montana Rail Link, Inc.*, 2003 MT 76, ¶ 6, 315 Mont. 13, ¶ 6, 67 P.3d 267, ¶ 6. We set forth our inquiry for summary judgment in *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264-65, 900 P.2d 901, 903, as follows:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred. [Citations omitted.]

In a summary judgment proceeding, the evidence must be viewed in the light most favorable to the non-moving party. *LaTray v. City of Havre*, 2000 MT 119, ¶ 15, 299 Mont. 449, ¶ 15, 999 P.2d 1010, ¶ 15. In reviewing the record, all reasonable inferences will be drawn in favor of the party opposing summary judgment. *LaTray*, ¶ 15.

¶14 This Court has routinely stated that the purpose of summary judgment is to eliminate unnecessary trials, but that summary adjudication should "never be substituted for a trial if a material factual controversy exists." *Boyes v. Eddie*, 1998 MT 311, ¶ 16, 292 Mont. 152, ¶ 16, 970 P.2d 91, ¶ 16. Ordinarily, questions of negligence are poorly situated to adjudication by summary judgment and are better left for jury determination at trial. *LaTray*,

¶ 15 (citing *Scott v. Henrich*, 1998 MT 118, ¶ 13, 288 Mont. 489, ¶ 13, 958 P.2d 709, ¶ 13; *Kolar v. Bergo* (1996), 280 Mont. 262, 266, 929 P.2d 867, 869; *Wiley v. City of Glendive* (1995), 272 Mont. 213, 216, 900 P.2d 310, 312; *Pappas v. Midwest Motor Express, Inc.* (1994), 268 Mont. 347, 350, 886 P.2d 918, 920; *Dillard v. Doe* (1992), 251 Mont. 379, 382, 824 P.2d 1016, 1018; and *Brown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1982), 197 Mont. 1, 10, 640 P.2d 453, 458).

## DISCUSSION

¶15 Peyatt asserts that Moore failed to inquire of Reuter about the nature of the hay loading operation, to insure that any equipment used by Reuter would be safe and to insure that Peyatt would be safe at Reuter's farm. He further asserts that Moore: (1) failed to provide him with any safety training related to hazards associated with loading hay onto flatbed trucks or with working around farm machinery, although Moore knew that he would be working around this type of machinery during the performance of his job; (2) failed to give him any information on accident and hazard reporting procedures, first aid, or work site hazards; and (3) never instructed him *not* to assist a farmer in the loading operation or *not* to do anything else reasonably necessary to accomplish the loading task.

¶16 Peyatt asserts these failures by Moore constituted a breach of the duty imposed on Moore by § 50-71-201, MCA. Section 50-71-201, MCA, states:

> **Employer to provide safe workplace and to purchase, furnish, and require use of health and safety items– safe practices.** Each employer shall:
> (1) furnish a place of employment that is safe for each of his employees;

7

(2) with the exception of footwear, purchase, furnish, and require the use of health and safety devices, safeguards, protective safety clothing, or other health and safety items, including but not limited to air masks, hardhats, and protective gloves, that may be required by state or federal law, the employer, or the terms of an employment contract, unless the terms of a collective bargaining agreement provide otherwise;

(3) adopt and use practices, means, methods, operations, and processes that are reasonably adequate to render the place of employment safe; and

(4) do any other thing reasonably necessary to protect the life, health, and safety of his employees.

The primary focus of Peyatt's argument, both before the District Court and this Court, is that Moore breached the duties imposed by subsection (3) which requires an employer to "adopt and use practices, means, methods, operations, and processes that are reasonably adequate to render the place of employment safe," and by subsection (4) which requires an employer to "do any other thing reasonably necessary to protect the life, health, and safety of his employees." Section 50-71-201(3) and (4), MCA.

¶17 Moore responds that § 50-71-201, MCA, does not apply to the facts surrounding Peyatt's injury. Focusing primarily on the Act's references to "place of employment," Moore agrees that § 50-71-201, MCA, requires an employer to provide a safe workplace and to otherwise furnish equipment and other items in the context of ensuring that the workplace is safe for its employees. Further, Moore even concedes that he owed a general duty to his employees, including Peyatt, to provide a safe place to work under § 50-71-201, MCA.

¶18 However, Moore asserts this duty did not extend to the location where Peyatt's injury occurred. Moore argues that "place of work" or "place of employment," under the facts of this case, would necessarily have to be the property owned by third-party defendant Reuter, where the injury took place. Moore argues that he had no control over or right to control

8

Reuter's property, and therefore, it cannot be a "place of work" or a "place of employment" such that a duty is triggered under § 50-71-201, MCA.

¶19 The District Court agreed with Moore. The District Court focused on the question of whether or not Reuter's property was a "place of employment" under § 50-71-201, MCA. The District Court indicated that, although "place of employment" is not defined by the Act, it must be a place which is controlled by the employer or over which the employer has the right to exercise control. The District Court held that, because Moore had neither control nor right of control to Reuter's farm, Peyatt's "place of employment" was limited to Moore's truck which Peyatt drove to the farm, and did not extend to the loading environment at the farm:

> And we get down to, [w]hat is a safe place to work? It's either limited to the truck that the Plaintiff operated; or if it's extended to the loading environment, which included the tractor and the power takeoff, then we have a question as to whether that environment was safe or not.
>
> . . . Defendant Reuter's farm and the loading environment, I must conclude, was not a place of work within the meaning of the Safe Place to Work Act.

¶20 This Court has previously rendered several decisions under § 50-71-201, MCA. Four of these decisions cited by Moore in support of his motion for summary judgment, and upon which the District Court based its decision granting Moore's motion for summary judgment, include: *Pollard v. Todd* (1966), 148 Mont. 171, 418 P.2d 869, *overruled on other grounds by State ex rel. Great Falls Nat'l Bank v. District Court* (1969), 154 Mont. 336, 344, 463 P.2d 326, 330; *Shannon v. Howard S. Wright Const. Co.* (1979), 181 Mont. 269, 593 P.2d 438; *Hackley v. Waldorf-Hoerner Paper Products Co.* (1967), 149 Mont. 286, 425 P.2d 712,

9

*overruled on other grounds by Lynch v. Reed* (1997), 284 Mont. 321, 328-29, 944 P.2d 218, 223;[1] and *Cain v. Stevenson* (1985), 218 Mont. 101, 706 P.2d 128.

¶21    Generally, the outcome of these cases turned on the *degree of control* the employer or his agent exercised over the workplace.  In *Pollard,* where an employee brought suit against his employer for personal injuries resulting from a fall from a scaffold, the lower court entered judgment for the employee, and the employer appealed.  This Court held that because the employer had actual, physical control of the scaffolding through the project supervisor who had selected a faulty plank in constructing the scaffolding and had directed the employee to assist, the employer was subject to liability for the employee's injury. *Pollard*, 148 Mont. at 177, 418 P.2d at 872.  In *Shannon*, where a subcontractor's employee brought suit against a general contractor for injuries resulting from a fall from a ladder, this Court held that since the defendant retained control over the working conditions at the job site, the general contractor had a duty to provide the employees of the subcontractor with a safe place to work.  *Shannon*, 181 Mont. at 281, 593 P.2d at 444.  And in *Hackley*, where an employee of an independent contractor was injured by a fall from a ladder at a job site, this Court held that the landowner was not liable for injuries suffered by the independent contractor's employee where the landowner did not retain control over the job site.

¶22    In *Cain*, consistent with *Pollard*, *Shannon*, and *Hackley*, the Court initially noted that, under the Act, a general contractor had an obligation to provide a safe workplace which

---

[1]*Hackley* is no longer applicable because the Legislature has since repealed and replaced the safety statute and the definition of "employer" under which the case was decided.  *See Shannon*, 181 Mont. at 282-83, 593 P.2d at 445.

10

extended to employees of subcontractors "when the general contractor controls job safety or has a non-delegable duty of safety arising out of contract." *Cain*, 218 Mont. at 103, 706 P.2d at 130 (citing *Shannon).* However, the Court concluded that the Act extended to subcontractors individually without further consideration of the control issue, reasoning only that the subcontractors were included under the Act simply by virtue of the broad definition of "employee" thereunder. *Cain*, 218 Mont. at 104, 706 P.2d at 131.

¶23 Peyatt correctly notes that these cases did not define "place of employment" for purposes of the Act, but rather focused on whether the duty to provide a safe place of employment extended to persons other than the employer. He reasons therefrom that the District Court erred in relying on these decisions. However, although not defining "place of employment," these cases nonetheless demonstrate that the employer's control over, or right to control, the location of the injury is essential to determining whether that location is the injured party's "place of employment" for purposes of the duties imposed by the Act. Obviously, without the right to control a location, an employer cannot make it safe. *See Shannon*, 181 Mont. at 283, 593 P.2d at 446 (the owner and general contractor both "had a duty to provide the employees of their subcontractors with a safe place to work because each retained control over the working conditions at the Stillwater condominium site"). Although the parties offer arguments regarding the course and scope of Peyatt's employment, the question here is not whether Peyatt was injured while engaged in his employment, but whether Moore violated his duty under the Act to "furnish" and "render" a safe place of

11

employment, requirements which necessitate control over the workplace. Section 50-71-201(1) and (3), MCA.

¶24 The facts in regard to Moore's control or right to control Reuter's farm are not in dispute. Moore had no involvement in the selection of Reuter as a donor of hay. Moore had no responsibility, under his contract with MFBF, with the loading of hay upon the truck, and was not involved in the method thereof, or the choice of loading equipment, its condition, operation or safety. Moore was not present, did not observe the loading, and, in short, did not participate in the events on Reuter's farm which led to Peyatt's injury. We conclude, therefore, as a matter of law, that Moore had no right to control that location and did not, under these circumstances, violate his duty under the Act to furnish a safe place to work under subsections (1) and (3) of § 50-71-201, MCA.

¶25 However, Peyatt also claims that Moore violated the employer's duty to ensure safety required by subsection (4) of § 50-71-201, MCA, which mandates that an employer "do any other thing reasonably necessary to protect the life, health, and safety of his employees." Peyatt argues that this provision creates a duty for the employer which is not dependent upon the workplace location. We agree.

¶26 We note initially that a clarification is needed in the nomenclature used to refer to § 50-71-201, MCA, which states: **"Short title.** This chapter may be cited as the 'Montana Safety Act.'"** Moore makes the common error of referring to this statute as the "Safe Place to Work" statute, asserting in his briefing that "absent the exercise of control, or at least the right to exercise control over the specific location alleged to be a place of employment, the

12

*Safe Place to Work Act* does not apply." (Emphasis added.) As quoted above, in its bench ruling granting Moore's motion for summary judgment, the District Court likewise stated that the loading environment "was not a place of work within the meaning of the *Safe Place to Work Act.*" (Emphasis added.) Moreover, at various times since § 50-71-201, MCA, was enacted in 1969, this Court has also referred to this provision as the "Safe Place to Work" statute, although, technically, the title of the Act has always been the "Montana Safety Act." *See e.g., Trankel v. Dept. of Military Affairs* (1997), 282 Mont. 348, 364, 938 P.2d 614, 624; *Stratemeyer v. Lincoln County* (1996), 276 Mont. 67, 79, 915 P.2d 175, 182; *Gibby v. Noranda Minerals Corp.* (1995), 273 Mont. 420, 427-28, 905 P.2d 126, 130-31; *Steiner v. Department of Highways* (1994), 269 Mont. 270, 276, 887 P.2d 1288, 1232; *Cain,* 218 Mont. at 104, 706 P.2d at 130; *Shannon*, 181 Mont. at 283, 593 P.2d at 445.

¶27     Although an error in nomenclature may itself be harmless, here the error helps to obscure the breadth of the Act. Although Moore frames the issue narrowly, i.e., whether Reuter's farm can properly constitute a "place of employment" under the "Safe Place to Work Act," Peyatt argues that the statute is broader. Peyatt correctly asserts that the statute also imposes a duty upon Moore to "do any other thing reasonably necessary to protect the life, health, and safety of his employees." Section 50-71-201(4), MCA. In his affidavit filed in opposition to Moore's motion for summary judgment, Peyatt averred Moore did not advise him that he could not assist a donor in the loading of hay, did not provide him with any safety training or safety instructions related to the loading of hay and did not provide

13

information related to farm machinery, although it was known to Moore that Peyatt would be working around such machinery.

¶28    The Wisconsin Supreme Court has held that the concept of "safe employment" is broader in scope than a "safe place of employment" and has explained that inclusion into the Wisconsin safety statute of the words "do every other thing reasonably necessary to protect the life, health, safety, and welfare" broadens the scope of the statute to mean safe employment rather than a mere place of employment which shall be safe:

> [W]hen [the Legislature] required the employer to "do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters," even the doctrine of *noscitur a sociis* cannot restrain the meaning of such words to the physical aspects of the place of employment alone, because the dominant subject, in connection with which such words are used, is employment which shall be safe rather than a mere place of employment which shall be safe.

*Miller v. Paine Lumber Co.* (Wis. 1930), 230 N.W. 702, 703.  To illustrate the point that "safe employment may require something besides a place of employment that is safe in a physical sense," the Wisconsin court invoked the example of an employee whose job it is to repair track in a railroad switching yard.  The court noted that to render safe the employment of such an employee, it may be necessary to require a warning of the approach of switching engines and train cars.  The court noted that in this illustration, and a myriad of others which one could think of, "safe employment calls for something in addition to a safe place of employment in a physical sense."  *Miller*, 230 N.W. at 703.

¶29    In *Stratemeyer*, we addressed a similar issue to the one raised by Peyatt: whether, under § 50-71-201, MCA, an employer was liable for an employee's injuries as a result of

14

the employer's failure to train or warn the employee of hazards inherent in the job. In *Stratemeyer*, a Lincoln County sheriff's officer sued the county and others for mental injuries (post-traumatic stress disorder) allegedly received when he witnessed the aftermath of a teenage girl's suicide on grounds that the county failed to train, counsel, and debrief him following the incident. *Stratemeyer*, 276 Mont. at 70, 915 P.2d at 176. Although the district court interpreted § 50-71-201, MCA, as excluding emotional harm, this Court agreed with Stratemeyer that the plain language of § 50-71-201, MCA, did not limit its application to only physical harm. *Stratemeyer*, 276 Mont. at 80, 915 P.2d at 182. We stated that subsection (4) of § 50-71-201, MCA, as well as § 50-71-203(3) and (4), MCA, constituted a "broad duty" on the part of an employer to assure an employee's safety. *Stratemeyer*, 276 Mont. at 80, 915 P.2d at 182. We remanded the case for jury determination as to whether the employer breached its duty in failing to train, supervise, treat, or debrief Stratemeyer, thereby incurring liability for his emotional injuries. *Stratemeyer*, 276 Mont. at 80, 915 P.2d at 182.

¶30      The broad language of subsection (4) of § 50-71-201, MCA, of the "Montana Safety Act," does not limit the statute's application only to the workplace. Peyatt has raised genuine issues of material fact regarding whether Moore fulfilled his duty under the statute to "do any other thing reasonably necessary to protect the life, health, and safety" of Peyatt while he was employed with Moore. Although the District Court correctly ruled that, as a matter of law, Reuter's farm could not be the "place of employment" for purposes of the Act, its entry of summary judgment in favor of Moore improperly foreclosed Peyatt's claim under

15

subsection (4) of § 50-71-201, MCA.  A question remains for the jury as to whether Moore breached this duty.

¶31     We reverse and remand for further proceedings consistent with this Opinion.


/S/ JIM RICE


We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM REGNIER

16

Chief Justice Karla M. Gray, dissenting.

¶32 I respectfully dissent from the Court's determination that § 50-71-201(4), MCA, of the Montana Safety Act imposed a duty on Moore to "do any other thing reasonably necessary to protect the life, health, and safety of" Peyatt under the circumstances presented here. I would affirm the District Court's grant of summary judgment to Moore.

¶33 I agree with the Court's conclusion that §§ 50-71-201(1) and -201(3), MCA, did not impose a duty on Moore to provide Peyatt with a safe place of employment at Reuter's farm in North Dakota because Moore had no control--or right to control--the conditions existing at that location. I also agree that § 50-71-201(4), MCA, imposes a duty upon an employer which is broader in scope than the duty to provide a safe place of employment. In my opinion, however, the Court interprets this duty too expansively. I would conclude that this broader duty did not arise under the facts of this case.

¶34 Section 50-71-201(4), MCA, requires an employer to "do any other thing reasonably necessary to protect the life, health, and safety of his employees." As the Court observes, the Wisconsin Supreme Court has held that nearly identical language in their work safety statutes creates a duty to provide "safe employment," which calls for something in addition to a physically "safe place of employment." See Miller v. Paine Lumber Co. (Wis. 1930), 230 N.W. 702, 703. Notably absent from the Court's discussion of Miller, however, is the Wisconsin court's actual holding in that case:

> We therefore hold that this statute does impose upon employers the duty to
> warn employees of dangers incident to their employment, not absolutely, but

17

when it is "reasonably necessary to protect the life, health, safety and welfare of such employees."

Miller, 230 N.W. at 703 (emphasis added). Thus, the duty to provide safe employment is a duty to protect employees from dangers "incident to their employment." "Incident" is defined as "[d]ependent upon, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance) . . . ." BLACK'S LAW DICTIONARY 777 (8th ed. 2004).

¶35 The following facts are set forth in the Court's opinion and undisputed by the parties. Moore's contract with the MFBF provided that Moore was to provide commercial transportation services to haul hay. The MFBF would advise donors of hay that the donor must make arrangements for loading the hay onto the transport trucks, and the MFBF informed Reuter he was to arrange for loading his donated hay onto the truck. In other words, Moore was to supply the necessary truck, trailer and equipment, and Reuter was to arrange for loading the hay. Under the contract between Moore and MFBF, Moore had no responsibility for the loading of hay onto the truck and was not involved with the choice of loading method, the choice of loading equipment or the loading equipment's condition, operation or safety. Moore employed Peyatt to pick up the load of hay in North Dakota and deliver it back to Montana.

¶36 Peyatt was employed to haul hay. The task of loading the hay onto the truck was not within the tasks that his performance of the job of hauling the hay required. I would conclude that any dangers arising from the loading of the hay were not dangers that were

18

"incident to" Peyatt's job of hauling the hay. Consequently, I would further conclude that it was not "reasonably necessary" for Moore to warn or train Peyatt regarding the hazards of loading hay and using the loading equipment provided by Reuter in order to protect Peyatt's life, health and safety. Where no reasonable necessity to warn or train exists, no duty arises under § 50-71-201(4), MCA.

¶37 The Court cites Stratemeyer v. Lincoln County (1996), 276 Mont. 67, 915 P.2d 175, in support of its conclusion that Moore owed a duty to Peyatt pursuant to § 50-71-201(4), MCA. I disagree. At the outset, the pertinent issue in Stratemeyer was whether the Montana Safety Act--and the broad duty to do anything reasonably necessary to protect the life, health and safety of employees under § 50-71-201(4), MCA--is applicable in cases where a plaintiff alleges only mental/psychological, as opposed to physical, injuries. The Court did not address § 50-71-201(4), MCA, in the context raised here. To the extent Stratemeyer may be applicable in any way, however, it supports the conclusion that no § 50-71-201(4), MCA, duty arose in this case.

¶38 In Stratemeyer, Deputy Sheriff Stratemeyer sued Lincoln County for damages for psychological injuries he suffered as a result of witnessing the aftermath of a young girl's suicide. Stratemeyer, 276 Mont. at 70-71, 915 P.2d at 176-77. Clearly, responding to the scene of the suicide was within the requirements of Stratemeyer's employment as a sheriff's deputy. Consequently, the psychological trauma resulting from responding to the dispatch call and witnessing the scene resulted from a danger "incident to" his employment as a deputy and, as a result, a duty arose under § 50-71-201(4), MCA, for Lincoln County to do

19

anything reasonably necessary to provide him with safe employment--e.g., train, supervise, treat and debrief Stratemeyer with regard to his job requirement of responding to the scene of a suicide. In the present case, Peyatt's employment did not include the requirement of loading the hay onto the truck and, therefore, the dangers of loading were not "incident to" his employment.

¶39 I would conclude that, while § 50-71-201(4), MCA, does impose a broad duty on an employer to provide employees with "safe employment," the duty arises only to the degree that is "reasonably necessary" in relation to the actual requirements of the employment. I would further conclude that, in this case, Peyatt was acting outside the range of his employment requirements at the time he was injured and § 50-71-201(4), MCA, does not apply.

¶40 I would affirm the District Court's grant of summary judgment to Moore and I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

20